UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

In the Matter of
STEPHANIE WARREN, Parent of Disabled Child
MICHAEL WARREN,

                    Plaintiff,                                    07 CV 9812 (JGK)


                    - against -


NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION
## FOR LEAVE TO FILE A MEMORANDUM OF LAW *AMICUS CURIAE*

---

Shawn V. Morehead (SM 5428)
Miranda Johnson (MJ 9281)
Erika Palmer
Arlen Benjamin-Gomez
Advocates for Children of New York, Inc.
151 W. 30th Street, 5th Floor
New York, New York 10001
Tel: (212) 947-9779

Yisroel Schulman (YS 3107)
Laura Davis  (LD 8226)
New York Legal Assistance Group
450 West 33rd Street, 11th Floor
New York, New York 10001
Tel.: (212) 613-5040

Michael D. Hampden (MH 2359)
Sandra Weinglass (SW 8646)
Erin K. McCormack
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, New York 10016
Tel.: (212) 683-7999

## TABLE OF CONTENTS

INTEREST OF THE AMICUS ORGANIZATIONS                    1

    A. Partnership for Children's Rights (PFCR)        2

    B. Advocates for Children of New York, Inc. (AFC)   2

    C. New York Legal Assistance Group (NYLAG)         2

AMICUS MOTIONS IN THE UNITED STATES DISTRICT COURT      3

LEGAL AND FACTUAL BACKGROUND                            4

ARGUMENT                                                7

          DIRECT TUITION PAYMENTS
          TO PRIVATE SCHOOLS ARE
          AUTHORIZED BY THE IDEA
          AND FEDERAL CASE LAW.

    A. The Supreme Court in Burlington Expressly Approved
       Direct Tuition Payments to Private Schools,
       in Addition to Reimbursement.                  7

    B. Following Burlington, Federal Courts Have Held that
       Direct Payments to Private Schools Are Authorized
       by the IDEA.                                  11

    C. The IDEA Grants Courts Broad Equitable Power
       to Fashion Appropriate Relief in Private School Tuition Cases.   13

    D. Denying Tuition Payments for Low-Income
       Parents Undermines the IDEA's Guarantee of FAPE.   16

CONCLUSION                                              20

## INTEREST OF THE AMICUS ORGANIZATIONS

The proposed Amicus organizations represent children with disabilities and their parents under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. The Amici submit this memorandum of law to address an issue critical to our low-income clients: may a hearing officer or court order a school district to make direct payments to an appropriate private school where the parent cannot afford to advance the tuition payments and later seek reimbursement?

In the case at bar, it is undisputed that Michael Warren is entitled to receive a free appropriate public education and that the New York City Department of Education (DOE) failed to provide that education. It is also undisputed that Bay Ridge Preparatory School (Bay Ridge) has a program that meets Michael's needs. Nevertheless, the State Review Officer (SRO) refused to order the DOE to pay Michael's tuition at Bay Ridge, because the parent was not seeking reimbursement for a payment that she had already made.

Our organizations collectively represent hundreds of students from low-income families who are not offered appropriate educational programs by the DOE and are accepted by private schools specializing in educating disabled students. If the SRO's position is not overturned, many hundreds of low-income children with disabilities will effectively lose the ability to seek placement in private school settings when the DOE fails to provide a suitable program, and the DOE will be absolved of its statutory duty under the IDEA to provide a free appropriate public education (FAPE) to children with disabilities from low-income families.

The Amicus organizations that join in this motion are as follows:

**A. Partnership for Children's Rights (PFCR).**

Founded in 1999, PFCR is authorized by the Appellate Division of the Supreme Court of the State of New York to provide legal services without fee to low-income families in civil legal matters involving the rights of children. Utilizing staff and volunteer attorneys, the organization represents children with disabilities, primarily in special education cases and Supplemental Security Income disability appeals.

**B. Advocates for Children of New York, Inc. (AFC).**

For over 35 years AFC has been working with low-income families to secure quality and equal public education services for their children.  AFC provides a range of direct services, including free individual case advocacy, technical assistance, and trainings, and also works on institutional reform of educational policies and practices. One of AFC's primary activities is providing free legal representation to low-income parents of students with disabilities at due process proceedings under the IDEA to ensure that their children receive the FAPE to which they are entitled.

**C. New York Legal Assistance Group (NYLAG).**

NYLAG is a not-for-profit law firm founded in 1990 to provide free civil legal services to low-income New Yorkers who would otherwise be unable to afford or receive legal assistance. NYLAG assists the poor and near-poor in New York City in accessing legal rights of vital importance. NYLAG's clients include, among others, seniors, immigrants, victims of domestic violence, Holocaust survivors and at-risk children. With regard to children, NYLAG represents them in special education cases and SSI appeals.

### AMICUS MOTIONS IN THE UNITED STATES DISTRICT COURT

District Courts have broad discretion to grant leave to organizations or individuals to appear as Amicus Curiae. See U.S. v. Yonkers Contracting Co., Inc., 697 F.Supp. 779, 781 (S.D.N.Y. 1988) (citing Hoptowit v. Ray, 682 F.2d 1237, 1260 (9th Cir.1982)). As this Court has stated: "The usual rationale for amicus curiae submissions is that they are of aid to the court and offer insights not available from the parties." United States v. El-Gabrowny, 844 F.Supp. 955, 957 n. 1 (S.D.N.Y. 1994) (citing United States v. Gotti, 755 F.Supp. 1157, 1158-59 (E.D.N.Y.1991)).

The moving Amicus organizations respectfully urge this Court to permit our appearance in this action, as we are in a position to offer a useful perspective on a critical issue raised by the administrative decision below. See Yonkers Contracting Co., Inc., 697 F.Supp. at 781 ("The Court decided to grant Civil Plaintiffs' request to serve as amicus curiae, since…the additional brief would aid this Court . . ."); see also United States v. City of New York, No. 07 Civ. 2067 (NGG), 2007 WL 2581911, at *5 (E.D.N.Y. Sep. 5, 2007) (granting a firefighter's union leave to appear as Amicus Curiae on the ground that "this union represents thousands of brave individuals who risk their lives each day for their fellow New Yorkers. Hence, to the extent that firefighter safety is involved in this case, I can see no reason why the court would not involve this union in determining how best to effectuate firefighters' important concerns.")

Further, the interests of the proposed Amicus organizations and those of their low-income clients would be adversely affected in subsequent proceedings by the SRO's decision below, unless reversed by this Court. See Yonkers Contracting Co., Inc., 697 F.Supp. at 781. Because the proposed Amici have a useful perspective and our clients

would be adversely affected by the outcome, the Court should grant this request to appear and submit this Memorandum of Law.

## LEGAL AND FACTUAL BACKGROUND

The principal purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs." 20 U.S.C. § 1400(d)(1)(A); Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 13 (1993). The United States Supreme Court has held that a free appropriate public education ("FAPE") is one that provides "specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." Bd. of Educ. v. Rowley, 458 U.S. 176, 201 (1982). This specialized instruction must be provided at "no cost to parents." 20 U.S.C. § 1401(29); see also Winkelman v. Parma City Sch. Dist., 127 S.Ct. 1994, 2000-2001 (2007).

In each academic year, a school district must offer every disabled student a FAPE. A school district's "offer of an educational placement must . . . be made on a timely basis, so that the child's parents have a reasonable opportunity to decide whether to accept the . . . recommendation, or make alternative arrangements." Application of a Child with a Disability, Appeal No. 96-30 at 8;[1] Application of a Child with a Disability, Appeal No. 98-36 (ruling that a school district must offer an appropriate placement before the start of each school year); see also 34 C.F.R. § 300.324 (requiring that each disabled child have a valid individual educational program in effect at the beginning of each school-year). Despite these requirements, the DOE fails in some cases to offer

---

[1] Citations in this format are to the decisions of the SRO. These decisions are accessible on the New York State Education Department website at http://www.sro.nysed.gov/decisionindex.htm.

4

students appropriate educational programs; and in other cases fails to offer any educational program – appropriate or otherwise.  See Matthew Lenaghan Declaration ¶¶ 5-6.

When the DOE fails to offer an appropriate placement to a student, or fails to offer a placement at all, the parent's only option is often to place his or her child in a private school.  Unilateral placement in private school is now a well-established remedy under the IDEA in cases where a school district fails to offer the student a FAPE.  See Burlington School Committee of Town of Burlington, Mass. v. Dept. of Educ. of Com. of Mass., 471 U.S. 359, 360-70, 374 (1985); Carter, 510 U.S. at 13; Frank G. v. Board of Educ., 459 F.3d 356, 370 (2d Cir. 2006).  Some families have the financial means to pay private school tuition and subsequently seek reimbursement from the DOE.  However, many families – like those the Amicus organizations represent – do not have the funds to pay private school tuition in advance and wait for reimbursement.

Many private schools will not accept students from low-income families because of their inability to make advance tuition payments.  Some schools do accept our clients without these large up-front payments, but even these schools cannot accept students without a reasonable expectation of eventual payment.  In New York City, Impartial Hearing Officers have routinely ordered direct payments to private schools where families cannot afford to pay tuition themselves.  In fact, the DOE itself frequently enters into settlement stipulations in which it agrees to pay private schools directly.  Direct tuition payment to private schools is thus an essential remedy for low-income families to access the unilateral private-school placement option countenanced by the Supreme Court in Burlington.

In Michael's case, however, the SRO ruled that parents have no right under the IDEA to request an order that a school district pay tuition directly to a private school. His ruling on this issue was not made in isolation; over the years the SRO has consistently decided that the IDEA only authorizes tuition payments to be ordered in the form of reimbursement.[2] These decisions confuse and compromise parents' rights under the IDEA. The SRO is the highest administrative appeal officer in the State. See N.Y. Educ. Law §§ 4404(2), (3). As such, in addition to the pernicious effect these holdings have in cases like the one at bar, the SRO's decisions inevitably affect the rulings and practice of hearing officers throughout the State.

For the reasons set forth below, the proposed Amicus organizations respectfully request this Court to declare that the SRO's prohibition against direct tuition payments to private schools is mistaken as a matter of law. We urge this Court to declare that an

---

[2] See, e.g., Application of a Child with a Disability, Appeal No. 06-035 at 14 (". . .I decline to direct that respondent pay tuition costs directly to Bay Ridge. Respondent shall provide reimbursement to petitioner for the cost of the student's tuition at Bay Ridge for the 2005-06 school year upon petitioner's presentation of proof of payment of such tuition."); Application of a Child with a Disability, Appeal No. 05-025 at 10, n. 1 ("When a FAPE and unilateral parental placements are at issue, an order by a hearing officer or a State Review Officer for a district to pay tuition costs at an unapproved placement is permissible only as an equitable remedy to reimburse parents once they have obtained and paid for appropriate services" [emphasis in original; citations omitted].); Application of the Board of Education of the Sewanhaka Central High School District, Appeal No. 04-037 at 11 ("[A]n order by a hearing officer or a State Review Officer for a district to pay tuition costs at an unapproved placement is permissible only as an equitable remedy to reimburse parents once they have obtained and paid for appropriate services [emphasis in original]."); Application of a Child with a Disability, Appeal No. 02-079 at 4 ("...respondent shall reimburse petitioner for the cost of her daughter's tuition at Blue Feather Elementary School during the 2002-03 school year, upon petitioner's submission to respondent of proof of such payment."); Application of a Child with a Disability, Appeal No. 06-106 at 8, n. 5, (dictum) ("Even if I had concluded that respondent had not satisfied its obligation to offer a FAPE, petitioner's request that respondent pay the tuition costs for the student at Winston would nevertheless fail. An order for a district to pay tuition costs at an unapproved placement is appropriate as an equitable remedy to reimburse parents once they have enrolled the student in the placement obtained and paid for appropriate services.); Application of a Child with a Disability, Appeal No. 04-092 at 4 (dictum) ("I note that when a FAPE and unilateral parental placements are at issue, an order by an impartial hearing officer or a State Review Officer for a district to pay tuition costs at an unapproved placement is permissible only as an equitable remedy to reimburse parents once they have obtained and paid for appropriate services.").

administrative officer or court may order a school district to make direct tuition payments

to a private school in order to effectuate the right to a FAPE.

## ARGUMENT

### DIRECT TUITION PAYMENTS TO PRIVATE SCHOOLS ARE AUTHORIZED BY THE IDEA AND FEDERAL CASE LAW.

**A.  The Supreme Court in Burlington Expressly Approved Direct Tuition Payments to Private Schools, in Addition to Reimbursement.**

In Burlington, a unanimous Supreme Court held that under the IDEA, where the

individualized education program (IEP) proposed by a public school district is unsuitable,

and a private school placement desired by the parents is proper, a court or administrative

officer can order the school district to pay the private school tuition in order to ensure that

the student is provided with a FAPE.  471 U.S. at 370-71.   The Court reasoned that

Section 1415 of the IDEA grants broad discretion to courts to fashion "appropriate"

relief.  Id. at 369.  The Court explained that, in these cases, "it seems clear beyond cavil

that 'appropriate' relief would include a prospective injunction directing the school

officials to develop and implement at public expense an IEP placing the child in a private

school." Id. at 370.

In Burlington, however, a prospective injunction was not applicable because the

parents had already paid the tuition. The Court recognized that there are cases where

prospective relief may not be adequate because "the review process is ponderous . . . [and

a] final judicial decision on the merits . . . will in most instances come a year or more

after the school term . . . has passed." Id. at 370.  Therefore the Court declined to limit

relief to a prospective injunction and held that appropriate relief must also include

retroactive reimbursement, where a parent has paid tuition in advance and then sought an order requiring payment by the school district. Id. The Court emphasized that reimbursement was an appropriate remedy because it "merely requires the Town to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper IEP." Id. at 370-71.

The Court's willingness to make an award of reimbursement did not imply that direct payment to a school is not an available remedy. Indeed, the Court analyzed the private school tuition remedy first and foremost in terms of direct payment to a private school, characterizing such relief as a "prospective injunction." The Court only approved reimbursement as an available remedy under the Act because the case before it involved parents who had the means to pay the tuition and then seek reimbursement.

The Court explained the difficult choice facing parents who seek to challenge the appropriateness of the public school placement offered to their disabled children:

> A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which <u>conscientious parents who have adequate means</u> and who are reasonably confident of their assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials. If that were the case, the child's right to a *free* appropriate public education, the parents' right to participate fully in developing a proper IEP, and all of the procedural safeguards would be less than complete.

471 U.S. at 370 (underlined emphasis added). Reasoning that Congress could not have intended to present the parents of disabled children with such an untenable choice, the

Supreme Court held that "by empowering the court to grant 'appropriate' relief Congress meant to include retroactive reimbursement to parents as an available remedy in a proper case." Id.

The SRO fundamentally misreads Burlington in this case, as he has in many previous cases (see note 2, supra). The SRO concluded that Burlington only approved the remedy of "retroactive reimbursement of private educational expenses" as an "available remedy under the IDEA." SRO Decision at 5. In support of this conclusion, the SRO cited a passage from Burlington noting that "parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk." SRO Decision at 5 (citing Burlington, 471 U.S. at 373-74). The risk alluded to by the Court is the risk assumed by a parent of losing his or her tuition demand by failing to prove any of the three necessary elements in a private school tuition case: i.e. the parent will be denied her tuition request if the hearing officer or court finds that the IEP proposed by the district was appropriate, or if the private school selected by the parent is not appropriate, or if the equities do not favor the parent's claim.

The "financial risk" language of the Burlington decision does not, as stated by the SRO, create a requirement that the parent must suffer an "out-of-pocket loss for the services provided by Bay Ridge." SRO Decision at 5. The SRO misconstrues the plain meaning of the Court's words when he equates the Court's concept of "financial risk" with a requirement that the parent incur a reimbursable debt by first paying the tuition.[3]

---

[3]    Compounding his error in misconstruing the Burlington concept that a parent assumes the risk of a unilateral placement of the student in a non-public school, the SRO went on to rule that in Michael's case the parent lacked standing because the enrollment contract (Parent's Impartial Hearing Exhibit B) placed upon the parent no enforceable legal obligation to pay the Bay Ridge tuition. SRO Decision, at 5-6. There

The case at bar presents the same issue as presented to the <u>Burlington</u> Court, but with the difference that this case involves a parent who lacked the financial means to pay

is absolutely no factual basis for this finding because the contract by its terms imposes upon the parent a clear responsibility for payment. It sets forth the annual tuition of $26,000.00 plus a book fee of $350.00 "for a total of $26,350.00," and then expressly states, in the line above the parent's signature, that the parent is "responsible for payments."

Further, the language in paragraph 4 of the contract does not relieve the parent of responsibility – it merely acknowledges that because the parent is unable to pay the tuition in advance of the school year, Bay Ridge "has assumed the risk that the Parent may not receive <u>prospective</u> payment from the DOE or that said payment will be delayed beyond the term of the 2005-2006 school year." (emphasis added). In other words, the plain language of the contract is not that the school accepts a risk that it may <u>never</u> be paid for its services, but only that it might not "receive prospective payment" and might even have to wait "beyond the term of the 2005-2006 school year," in view of the prolonged hearing process that may be required.

The SRO's ruling that plaintiff lacked standing to obtain a direct tuition payment is not supported by the cases on which he relies. Michael's case is fully distinguishable from <u>Emery v. Roanoke City Sch. Bd.</u>, 432 F.3d 294 (4th Cir. 2005), cited by the SRO. In <u>Emery</u>, the student sought reimbursement for an expense already paid by his parent's insurance company, which acknowledged its obligation to pay and in fact did pay the educational costs at issue. 432 F.3d at 299. Unlike <u>Emery</u>, no one in Michael's case has acknowledged financial responsibility, and unlike <u>Emery</u>, the parent seeks no windfall in this case. Indeed, it is the <u>DOE</u> here that will benefit from a windfall if it is left completely "off the hook" for an obligation that, in the words of the <u>Burlington</u> Court, the district "should have paid all along and would have borne in the first instance had it developed a proper IEP." 471 U.S. at 371.

<u>Piedmont Behavioral Health Center v. Stewart</u>, 413 F. Supp. 2d 746 (S.D. W. Va. 2006), also relied on by the SRO, is likewise distinguishable from this case. In <u>Piedmont</u>, the parents and the psychiatric treatment facility where the student was placed sued for payment to the facility, but the court found that neither plaintiff had standing to assert an IDEA claim, finding that the facility did not constitute a "party aggrieved" within the meaning of the IDEA because it was neither a parent nor a "child with a disability." 413 F. Supp. 2d at 754. The court held that the parents were not entitled claim direct payment because they did not suffer a monetary injury, noting that "plaintiffs have not alleged that Piedmont has sought payment from [the student's mother] for the costs associated with educating her son or that she expects to be held responsible for these costs." <u>Id</u>. at 755. These facts plainly distinguish this case from the one at bar.

<u>Malone v. Nielson</u>, 474 F.3d 934 (7th Cir. 2007), also lends no support to the result reached by the SRO. <u>Malone</u> was a reimbursement case, not a direct payment case. The complaint was dismissed, first, because the expenditures for which the parents sought reimbursement were paid by the (adult) student himself, not the parents, and second, because the student involved was deceased, and the parents lacked standing to sue for damages on behalf of the estate. 474 F.3d at 937.

Even if it were not clear, as it is here, that the parent incurred a personal legal obligation for tuition payments under the enrollment agreement she signed, there would be ample authority for the Court to order direct tuition payments to Bay Ridge considering the circumstances of this case. The enrollment agreement, which was clearly not drafted by lawyers, expresses the intent to facilitate a process by which a low-income family can access the benefits of the IDEA for a handicapped student. The record in Michael's case makes clear that the school district failed to carry out its statutory obligations to the student, and this denial of FAPE constitutes an injury sufficient to confer standing. <u>See, e.g.</u>, <u>Heldman v. Sobol</u>, 962 F.2d 148, 155 (2d Cir. 1992) ("The central role of the IDEA process rights bears witness that Congress intended to create procedural rights the violation of which would constitute injury in fact."). As more fully set forth below in Section C (<u>see infra</u> at 13), the IDEA confers upon federal courts expansive authority to fashion appropriate, equitable relief in order to carry out the purposes of the Act. Surely these equitable powers must trump any narrow, legalistic rationale such as the SRO's "standing" argument. The choice is whether to advance the IDEA's remedial purposes for this disabled child, or to frustrate those purposes by leaving the student without the remedy provided for him by law.

the private school tuition in advance.  Low-income families should not be foreclosed

from the private-school option solely because of their economic circumstances.  Both the

reasoning and the express language of <u>Burlington</u> make clear that direct payment to

private schools is an available remedy under the IDEA where necessary to ensure a FAPE

as guaranteed by the Act.

 This Court should thus find that <u>Burlington</u> authorizes an administrative officer or

court to order a school district to make direct tuition payments to a private school in order

to effectuate the right to a FAPE, without first requiring the tuition to be paid by the

parent.

**B.  <u>Following Burlington, Federal Courts Have Held that Direct Payments to<br>Private Schools Are Authorized by the IDEA.</u>**

 Applying the reasoning in <u>Burlington</u>, federal courts have fashioned appropriate

relief in the form of prospective tuition payment, where such relief was necessary to

ensure a FAPE to families that could not afford to front the cost of a private school

placement.

 In <u>Draper v. Atlanta Independent School System</u>, 518 F.3d 1275 (11th Cir. 2008),

the Eleventh Circuit Court of Appeals held that where a public school district has failed

to provide an appropriate education and the family is financially unable to unilaterally

place the student in a private school at its own expense, the court may award direct

payment to the private school for appropriate services.  The Court, borrowing a phrase

from <u>Burlington</u>, reasoned that when the public school has failed to provide an

appropriate education, a prospective injunction placing a student in a private program is

"beyond cavil." <u>Id</u>. at 1285.  The Court rejected the school district's argument that a

prospective award differs materially from an award of reimbursement, and refused to interpret the IDEA in such a way as to "create an anomaly in the law" that "would provide those wealthier parents greater benefits under the Act than poorer parents." Id. at 1286. The Court went on to uphold an award of prospective tuition payment for a non-approved private school.

In Connors v. Mills, 34 F. Supp. 2d 795 (N.D.N.Y. 1998), the U.S. District Court for the Northern District of New York also determined that direct tuition payment is available to parents who have satisfied the elements established by the Supreme Court in Burlington, and demonstrated that they cannot afford to pay the tuition at their child's private school in advance. 34 F.Supp. 2 at 805-06 ("[O]nce the Burlington prerequisites relative to a non-approved private school are met, and a parent shows that his or her financial circumstances eliminate the opportunity for unilateral placement in the non-approved school, the public school must pay the cost of private placement immediately."(footnote omitted)). In support of this conclusion, the Court reasoned that "[i]t simply cannot be the case that an act designed to grant 'all' disabled children access to needed services would undermine that very goal by making such access dependent upon a family's financial situation." Id. at 804.

Although the Connors Court found that the parents in the case before it were not entitled to direct tuition payment because they did not establish financial need, its decision is persuasive authority for the availability of that remedy. In expressing its judgment that direct tuition payment is an available remedy under the IDEA, the Connors Court took the Supreme Court's decision in Burlington to its logical conclusion. The Connors Court reasoned that "[i]n a situation where a parent does not have the adequate

12

means to finance unilateral private placement and is told by a court years later that they were right, the victory would not only be empty but meaningless." <u>Connors</u>, 34 F. Supp. 2d at 804 (emphasis in original).  Refusing to find that the IDEA provided more relief to parents of means than to those with little or no income, the court interpreted <u>Burlington</u> to allow for low-income disabled children to receive prospective tuition payment.  See <u>id.</u>; see also <u>Susquenita Sch. Dist. v. Raelee S.</u>, 96 F.3d 78, 86-87 (3rd Cir. 1996) ("The purpose of the Act, which is to ensure that every child receive a 'free and appropriate education' is not advanced by requiring parents, who have succeeded in obtaining a ruling that a proposed IEP is inadequate, to front the funds for continued private education."); <u>Sabatini v. Corning-Painted Post Area School Dist.</u>, 78 F. Supp.2d 138 (W.D.N.Y 1999) (finding disabled student entitled to preliminary injunction requiring school district to pay for private residential placement).

## C.  **The IDEA Grants Courts Broad Equitable Power to Fashion Appropriate Relief in Private School Tuition Cases.**

In order to protect the right of a disabled child to a free appropriate public education, the IDEA gives courts broad discretion to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii).  The Supreme Court has interpreted this statutory provision to "confer[] broad discretion on the court," <u>Burlington,</u> 471 U.S. at 369, to grant relief that is "'appropriate' in light of the purpose of the Act," <u>id.</u>, and has stated that "equitable considerations are relevant in fashioning relief." <u>Id.</u> at 374; see also <u>Frank G.</u>, 459 F.3d at 371 ("One of the primary ways in which the IDEA seeks to ensure that children with disabilities receive a free appropriate education is by conferring broad discretion on the district court to grant relief it deems

appropriate . . ."); Jennifer D. v. New York City Dep't of Educ., No. 06 Civ. 15489 (JGK), 2008 WL 857554, at *5 (S.D.N.Y. Mar. 31, 2008) ("If the two-part Burlington test is satisfied, the Court has discretion to consider relevant equitable factors in fashioning relief.").

In its 1997 reauthorization of the IDEA, Congress addressed the private school tuition remedy approved in Burlington. See 20 U.S.C. § 1412(a)(10). However, these new provisions did not supplant the pre-existing equitable powers conferred upon courts by § 1415 of the Act. To the contrary, the IDEA's express grant of equitable authority to the courts to fashion appropriate relief is independent of, and unlimited by, specific provisions in the statute addressing tuition reimbursement.

The U.S. Department of Education, in its comments to the 1999 and 2006 federal regulations, emphasized the continued authority of courts and hearing officers to fashion appropriate remedies when necessary to carry out the purposes of the Act. See Placement of Children by Parent if FAPE Is at Issue, 64 Fed. Reg. 12,602 (Mar. 12, 1999) ("[H]earing officers and courts retain their authority, recognized in Burlington and [Carter], to award 'appropriate' relief if a public agency has failed to provide FAPE, including reimbursement and compensatory services, under [20 U.S.C. § 1415(i)(2)(C)(iii)]. . . . This authority is independent of their authority under [20 U.S.C. § 1412(a)(10)(C)(ii)] to award reimbursement for private placements of children who previously were receiving special education and related services from a public agency."); Placement of Children by Parent if FAPE is at Issue, 71 Fed. Reg. 46,599 (Aug. 14, 2006) (same).

The SRO himself has recognized that the equitable power of courts and hearing officers under 20 U.S.C. § 1415(i)(2)(C)(iii) is independent of and broader than the specific tuition reimbursement provisions of the Act. See Application of a Child with a Disability, Appeal No. 07-070 (ordering payment for tuition and transportation costs for a student unilaterally enrolled in an out-of-district public school). The SRO seems to accept that the IDEA confers broad equitable authority to order tuition payments in the context of a public school placement, but is unaccountably unwilling to recognize the principle when it comes to private school tuition.

In Frank G., the Second Circuit Court of Appeals echoed this principle. The Court noted that the IDEA's lack of a specifically described remedy does not imply that such a remedy is unavailable under the IDEA. 459 F. 3d at 370 ("Under these circumstances, we think it is hardly clear from the fact that § 1412(a)(10)(c)(ii) provides for parental reimbursement in one circumstance, that it excludes reimbursement in other circumstances.") .

The school district in Frank G. relied on language in the IDEA that authorized reimbursement to parents of disabled children "who previously received special education and related services under the authority of a public agency." 20 U.S.C. § 1412(a)(10)(C)(ii) (1997). The Court, however, concluded that the Act's reimbursement provision in § 1412 does not prohibit reimbursement in other circumstances, finding ample authority for an award of tuition reimbursement under § 1415. 459 F.3d at 376. Similarly, the Act's explicit provision for reimbursement in § 1412 does not imply that direct payment to private schools is unavailable under § 1415.

**D.  Denying  Direct  Tuition  Payments  for  Low-Income  Students Undermines the IDEA's Guarantee of FAPE.**

A fundamental principle of the IDEA is that disabled students are entitled to a FAPE. 20 U.S.C. § 1400(d)(1)(A); Burlington, 471 U.S. at 367 ("Congress stated the purpose of the Act in these words: 'to assure that all handicapped children have available to them . . . a free appropriate public education . . .'"(citation omitted); Carter, 510 U.S. at 13 ("[The] IDEA was intended to ensure that children with disabilities receive an education that is both appropriate and free.").  Federal courts that have been asked by school districts to limit private school tuition remedies based on some purportedly competing provision of the IDEA have rejected such arguments when they posed a conflict with the right to a FAPE.

Thus, the Burlington Court held that where a child's right to an appropriate education conflicts with the school district's IEP, FAPE must prevail and the parent must be reimbursed for tuition payments to the private school that was ultimately determined to be appropriate. 471 U.S. at 372.

In Carter, the Court held that where a child's substantive right to a FAPE conflicts with the state's private school approval process, FAPE must prevail. 510 U.S. at 13-14.

Citing Carter, the Second Circuit held in Pawling Central Sch. Dist. v. Schutz, 290 F.3d 476 (2nd Cir. 2002), cert. den. 537 U.S. 1227 (2003), that the school district was obligated to pay tuition for a non-approved private school during the pendency of due process proceedings, for to hold otherwise would violate the Act's guarantee of an

16

appropriate education simply because the private school lacks the official state stamp of approval.. Id., at 484.

In Frank G., the Second Circuit, relying in part on Burlington, held that the school district was obligated to pay tuition for a non-public school even though the student had not previously received special education services in the district. 459 F.3d at 372. Again, "the tension between different sections of the IDEA" – on the one hand, a student's right to a FAPE, and on the other, a provision that seemingly limits private school reimbursement to cases where the student has previously received public services – must be resolved in favor of "the express purpose" of the Act, the provision of FAPE. See 459 F.3d at 371.

The IDEA's guarantee of a FAPE cannot be rationed out to students in proportion to the financial means of their parents. A FAPE is guaranteed to all disabled students. See 20 U.S.C. § 1431(a)(5) ("Congress finds that there is an urgent and substantial need – to enhance the capacity of State and local agencies and service providers to identify, evaluate, and meet the needs of all children, particularly minority, low-income, inner city, and rural children, and infants and toddlers in foster care.") (emphasis added).

Throughout the IDEA, the interests of low-income families are fostered and protected. See, e.g., 20 U.S.C. § 1481(d)(3)(C) (providing that in awarding grants, contracts, or cooperative agreements, the Secretary may give priority to, inter alia, "projects that address the needs of children from low income families"); 20 U.S.C. § 1453(b)(8) (providing that States must "describe the steps the State educational agency

will take to ensure that poor and minority children are not taught at higher rates by teachers who are not highly qualified").[4]

When the public school system fails in its duty to provide an appropriate education to a disabled child, courts should not limit the IDEA's remedies because of a parent's inability to front the costs of a private education that meets the student's needs. As the Supreme Court recently emphasized in <u>Winkelman</u>, the rights conferred upon parents under the IDEA must be read broadly so as to avoid leaving some handicapped children who are denied a FAPE without a remedy. The Court observed: "[W]e find nothing in the statute to indicate that when Congress required States to provide adequate instruction to a child 'at no cost to parents,' it intended that only some parents would be able to enforce that mandate." 127 S.Ct. at 2005.

Under the IDEA, the obligation to provide a FAPE to disabled students is the responsibility of the state and local educational agencies. 20 U.S.C. § 1400(c)(6). The Congressional intent of the Act as evidenced in its earliest legislative history was to place

---

[4] <u>See also</u> 20 U.S.C. § 1437(b)(7) (providing that any State that applies for a grant under 20 U.S.C. § 1433 "shall provide satisfactory assurance that policies and procedures have been adopted to ensure meaningful involvement of underserved groups, including minority, <u>low-income</u>, homeless, and rural families and children with disabilities who are wards of the State, in the planning and implementation of all the requirements of this subchapter") (emphasis added); 20 U.S.C. § 1471(a)(2)(iii) (providing that, in order to support parent training, grants may be awarded to parent organizations "the parent and professional members of which are broadly representative of the population to be served, including low-income parents and parents of limited English proficient children"); 20 U.S.C. § 1472(a)(1) ("The Secretary may award grants to, and enter into contracts and cooperative agreements with, local parent organizations to support community parent resource centers that will help ensure that underserved parents of children with disabilities, <u>including low income parents</u>, parents of limited English proficient children, and parents with disabilities, have the training and information the parents need to enable the parents to participate effectively in helping their children with disabilities – (A) to meet developmental and functional goals, and challenging academic achievement goals that have been established for all children; and (B) to be prepared to lead productive independent adult lives, to the maximum extent possible.") (emphasis added); 20 U.S.C. § 1454(a)(3)(B)(iv) (providing that States receiving grants must use grant funds to support at least one of a list of activities that includes "[p]roviding professional development activities that . . . (B) improve the knowledge of special education and regular education teachers and principals and, in appropriate cases, paraprofessionals, concerning effective instructional practices, and that . . . (iv) provide training to enable personnel to work with and involve parents in their child's education, including parents of <u>low income</u> and limited English proficient children with disabilities") (emphasis added).

direct responsibility on the state agency for the education of every disabled child, and to

prohibit the state from delegating financial responsibility to parents.  As the Senate

Report accompanying the original enactment of the legislation in 1975 explained:

> The primary purpose of funds under this Act is to assure all handicapped children an appropriate education. It is expected that <u>necessary arrangements to achieve this goal will be made by local educational agencies.</u>

S. Rep. 94-168, at 16 (1975), <u>reprinted in</u> 1975 U.S. Code Cong. & Admin. News 1425,

1440 (emphasis added).

> This provision is included specifically to assure a single line of responsibility with regard to the education of handicapped children, and to assure that in the implementation of all provisions of this Act and in carrying out the right to education for handicapped children, the State educational agency shall be the responsible agency.  . . . The Committee [on Labor and Public Welfare] considers the establishment of single agency responsibility for assuring the right to education of all handicapped children of paramount importance. Without this requirement, there is an abdication of responsibility for the education of handicapped children.

<u>Id</u>. at 24 (1975), <u>reprinted in</u> 1975 U.S. Code Cong. & Admin. News 1425, 1448.[5]

The SRO's persistent refusal to require school districts to pay tuition costs directly

to private schools is irreconcilable with this legislative mandate holding states solely

responsible for ensuring that FAPE is provided without cost to the parent. By absolving

the DOE of its financial responsibility in Michael's case, the SRO presented the DOE

with a windfall – a financial reward for failing to offer Michael an appropriate

educational program.

---

[5] <u>See also</u>  S. Rep. No. 94-168, at 10 (1975), <u>reprinted in</u> 1975 U.S. Code Cong. & Admin. News 1425, 1434 and 1456 (1975) ("(p)arents of [handicapped] children have the right to expect that individually designed instruction to meet their children's specific needs is available" and that the instruction would be provided at "no cost to the parents of a handicapped child.").

Therefore, we urge this Court to reject the SRO's analysis, which if undisturbed will enable the DOE and other New York State school districts to deprive low-income students of a FAPE by denying their parents of the private-school tuition remedy available to all others.

## CONCLUSION

For the reasons set forth herein, the proposed Amicus organizations respectfully request this Court to overrule the finding of the SRO that a parent must make tuition payments to the private school in which she has unilaterally placed her child before she may request payment from the school district. The Amicus organizations urge this Court to declare that an administrative officer or court may order a school district to make direct tuition payments to a private school in order to effectuate the right to a FAPE.

Dated: New York, New York
June 20, 2008

Respectfully submitted,

Shawn V. Morehead (SM 5428)
Erika Palmer
Arlen Benjamin-Gomez
Miranda Johnson (MJ 9281)
Advocates for Children of New York
151 W. 30th Street, 5th Floor
New York, New York 10001
Tel: (212) 947-9779

Michael D. Hampden (MH 2359)
Sandra Weinglass (SW 8646)
Erin K. McCormack
Partnership for Children's Rights
271 Madison Avenue, 17th Floor
New York, New York 10016
Tel.: (212) 683-7999

*Laura Davis*

Yisroel Schulman (YS 3107)
Laura Davis  (LD 8226)
New York Legal Assistance Group
450 West 33rd Street, 11th Floor
New York, New York 10001
Tel.: (212) 613-5040