UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

S.W., Parent of Disabled Child M.W.,

                    Plaintiff,

          - against -                          07 Civ. 9812 (JGK)

                                               OPINION AND ORDER
NEW YORK CITY DEPARTMENT OF
EDUCATION,

                    Defendant.
————————————————————————————————

JOHN G. KOELTL, District Judge:

     The plaintiff, S.W. ("S.W."), brings this action on behalf
of her son M.W. pursuant to the Individuals with Disabilities in
Education Act ("IDEA"), 20 U.S.C. §§ 1400 et seq., against the
New York City Department of Education (the "DOE").  S.W. appeals
the decision of the State Review Officer ("SRO") denying her
claim for direct payment of her son's tuition to the Bay Ridge
Preparatory School ("Bay Ridge"), a private school at which she
unilaterally placed M.W. for the 2005-06 school year.  The SRO's
decision reversed the decision of an Impartial Hearing Officer
("IHO") which granted direct tuition payment to Bay Ridge.  The
parties have cross-moved for summary judgment.  Amicus
organizations Partnership for Children's Rights, Advocates for
Children of New York, Inc., and New York Legal Assistance Group
have moved for leave to file a memorandum of law amicus curiae.
The Court grants that motion and has considered that brief and

subsequent submissions.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 20 U.S.C. § 1415(i)(2)(A).

## I.

"Under the IDEA, states receiving federal funds are required to provide 'all children with disabilities' a 'free appropriate public education.'"  Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (quoting 20 U.S.C. § 1412(a)(1)(A)); see also Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998).  A free appropriate public education ("FAPE") must provide "special education and related services tailored to meet the unique needs of a particular child, and be 'reasonably calculated to enable the child to receive educational benefits.'"  Walczak, 142 F.3d at 122 (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982) (internal quotation marks and citation omitted)).  Because the IDEA expresses a "strong preference for children with disabilities to be educated, 'to the maximum extent appropriate,' together with their non-disabled peers, special education and related services must be provided in the least restrictive setting consistent with a child's needs."  Id. (internal citation omitted); see also Grim v. Rhinebeck Cent. Sch. Dist., 346 F.3d 377, 379 (2d Cir. 2003).

These services are administered through a written individualized education program ("IEP"), which must be updated at least annually. Walczak, 142 F.3d at 122; see also 20 U.S.C. § 1414(d).  In New York, the responsibility for developing an appropriate IEP for a child is assigned to a local Committee on Special Education ("CSE").  Walczak, 142 F.3d at 123.

Parents in New York who wish to challenge their child's IEP as insufficient under the IDEA may request an impartial due process hearing before an IHO appointed by the local board of education.  Id. (citing 20 U.S.C. § 1415(f) and N.Y. Educ. Law § 4404(1)).  A party may appeal the decision of the IHO to an SRO, and the SRO's decision may be challenged in either state or federal court.  Id. (citing 20 U.S.C. § 1415(g), 1415(i)(2)(A) and N.Y. Educ. Law 4404(2)); see also Jennifer D. v. New York City Dep't of Educ., 550 F. Supp. 2d 420, 424 (S.D.N.Y. 2008).

Under the IDEA, a district court independently reviews the administrative record, along with any additional evidence presented by the parties, and must determine by a preponderance of the evidence whether the IDEA's provisions have been met.[1] Grim, 346 F.3d at 380; see also Mrs. B. v. Milford Bd. of Educ.,

---

[1] Courts have noted that "summary judgment appears to be the most pragmatic procedural mechanism in the Federal Rules for resolving IDEA actions," but that "[t]he inquiry . . . is not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed."  Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996); see also Antonaccio v. Bd. of Educ. of Arlington Cent. Sch. Dist., 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).

103 F.3d 1114, 1120 (2d Cir. 1997).  This independent review,
however, is "by no means an invitation to the courts to
substitute their own notions of sound educational policy for
those of the school authorities which they review." Rowley, 458
U.S. at 206.  The Court of Appeals for the Second Circuit has
explained that "federal courts reviewing administrative
decisions must give 'due weight' to these proceedings, mindful
that the judiciary generally 'lack[s] the specialized knowledge
and experience necessary to resolve persistent and difficult
questions of educational policy.'" Gagliardo, 489 F.3d at 113
(quoting Rowley, 458 U.S. at 206, 208); see also Cerra v.
Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005).

        Deference to the decision in the administrative record is
particularly appropriate when the administrative officers'
review has been thorough and careful, and when the Court's
decision is based solely on the administrative record.  See
Walczak, 142 F.3d at 129; Frank G. v. Bd. of Educ., 459 F.3d
356, 367 (2d Cir. 2006).  Where the findings of the IHO and SRO
conflict, the findings of the IHO "may be afforded diminished
weight." A.C. and M.C. v. Bd. of Educ. of The Chappaqua Cent.
Sch. Dist., 553 F.3d 165, 171 (2d Cir. 2009) (quoting Gagliardo,
489 F.3d at 113 n.2); Jennifer D., 550 F. Supp. 2d at 429.
Accordingly, the Court "'defer[s] to the final decision of the
state authorities,' even where 'the reviewing authority

4

disagrees with the hearing officer.'"  <u>A.C.</u>, 553 F.3d at 165

(quoting <u>Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch.</u>

<u>Dist.</u>, 736 F.2d 873, 877 (2d Cir. 1984)).

II.

The following facts and procedural background are taken

from the administrative record.

S.W. is the parent of M.W.  (Pl.'s 56.1 Statement ¶ 1;

Def.'s Resp. to Pl.'s 56.1 Statement ("Def.'s 56.1 Resp.") ¶ 1.)

M.W. was born in 1989 and, at the beginning of the 2005-2006

school year, was fifteen years old.  (Pl.'s 56.1 Statement ¶ 1;

Def.'s 56.1 Resp. ¶ 1.)  He is classified as a student with a

learning disability and is eligible for special education

services under the IDEA.  (Pl.'s 56.1 Statement ¶ 1; Def.'s 56.1

Resp. ¶ 1.)  M.W. has been a special education student since

kindergarten.  (Aff. of S.W. ("S.W. Aff.") ¶ 2.)  From

kindergarten through fifth grade, M.W. attended P.S. 222, a

public school.  (Pl.'s 56.1 Statement ¶ 3; Def.'s 56.1 Resp. ¶

3.)  S.W. alleges that M.W. experienced learning difficulties

and performed poorly in school while at P.S. 222.  (Pl.'s 56.1

Statement ¶ 4.)  He was held back in the first grade, although

he was subsequently promoted through second, third, fourth, and

fifth grade.  (Pl.'s 56.1 Statement ¶ 4; Def.'s 56.1 Resp. ¶ 4.)

S.W. alleges that during M.W.'s fifth grade year, she

realized that he was not learning in his special education class

5

at P.S. 222. (S.W. Aff. ¶ 10.) According to S.W., M.W. was barely reading and writing on the second grade level. (S.W. Aff. ¶ 10.) After M.W. completed the fifth grade, S.W. rejected the DOE's proposed sixth grade placement in the special education program at P.S. 222 and unilaterally enrolled him in a special education program at Bay Ridge, a private school. (Pl.'s 56.1 Statement ¶¶ 2, 6; Def.'s 56.1 Resp. ¶¶ 2, 6.) Bay Ridge has not been approved by the Commissioner of Education as a school with which school districts may contract to instruct students with disabilities. (Pl.'s 56.1 Statement ¶ 8; Def.'s 56.1 Resp. ¶ 8.) In 2001, M.W. began the sixth grade at Bay Ridge and continued to attend Bay Ridge through 2008. (Pl.'s 56.1 Statement ¶ 7; Def.'s 56.1 Resp. ¶ 7.)

S.W. alleges that when she first enrolled M.W. at Bay Ridge, in 2001, she was unable to pay his tuition. (Pl.'s 56.1 Statement ¶ 9.) S.W. alleges that she signed an enrollment contract with Bay Ridge with the understanding that she would be legally responsible for M.W.'s tuition if she were not ultimately successful in obtaining an order requiring the DOE to pay it. (S.W. Aff. ¶¶ 15, 17.) She sought financial assistance from the DOE, and the DOE agreed to subsidize the cost of M.W.'s tuition for the 2001-2002 school year. (Pl.'s 56.1 Statement ¶¶ 9-10; Def.'s 56.1 Resp. ¶¶ 9-10.) For the 2002-2003, 2003-2004, and 2004-2005 school years, S.W. obtained payment from the DOE

for M.W.'s tuition in a similar manner.  In each of those years, the DOE classified M.W. as learning disabled and recommended that he be placed in a special education class in a public school.  (Pl.'s 56.1 Statement ¶ 11; Def.'s 56.1 Resp. ¶ 11.) In each of those years, S.W. challenged the DOE's proposed placements, and the DOE agreed to pay M.W.'s tuition costs. (Pl.'s 56.1 Statement ¶¶ 12-13; Def.'s 56.1 Resp. ¶¶ 12-13; S.W. Aff. ¶¶ 19, 20.)

In the 2005-2006 school year, however, S.W. did not succeed in obtaining payment for M.W.'s tuition from the DOE.  On June 2, 2005, M.W.'s CSE held its annual meeting to develop his IEP for the 2005-2006 school year.  The CSE meeting was attended by S.W., another parent member, a representative from the district, a school psychologist, a school social worker, and two teachers from Bay Ridge.  (Def.'s 56.1 Statement ¶ 6; Pl.'s Resp. to Def.'s 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 1.)  The IEP developed at the meeting classified M.W. as learning disabled and recommended that he be placed in a special class environment with a 15:1 student to staff ratio.  (Ex. 1 at 1, 7.)

According to S.W., the meeting was not satisfactory.  She alleges that the Bay Ridge teachers participated in the meeting for "less than ten minutes," and that the academic goals and objectives listed in the IEP were not developed at the meeting but were prepared by the attending school psychologist after the

Case 1:07-cv-09812-JGK   Document 38   Filed 03/30/09   Page 8 of 36

meeting. (Pl.'s 56.1 Statement ¶ 19.) She alleges that she and the two Bay Ridge teachers allegedly told the CSE at the meeting that they believed a 15:1 ratio was not appropriate for M.W.'s needs. (Pl.'s 56.1 Statement ¶¶ 16-17.) They also allegedly challenged the accuracy of the psycho-educational evaluation that M.W. received as part of his triennial reevaluation. (Pl.'s 56.1 Statement ¶ 18.) However, there is nothing in the record to indicate that S.W. told the CSE that she would reject the proposed placement and enroll M.W. at Bay Ridge. On or about June 8, 2005, S.W. received a Final Notice of Recommendation indicating that the CSE had recommended that M.W. be placed in a 15:1 special education class at James Madison High School ("James Madison"). (Pl.'s 56.1 Statement ¶ 21; Def.'s 56.1 Resp. ¶ 21; Ex. 6.)

On August 15, 2005, S.W. signed a contract to enroll M.W. at Bay Ridge for the 2005-2006 school year. (Def.'s 56.1 Statement ¶ 10; Pl.'s 56.1 Resp. ¶ 1; Ex. B.) Item 1 of the contract lists the cost of tuition, $26,350. (Ex. B.) Item 2 states, in pertinent part:

> The Parent acknowledges that, in the event they have been offered a public school placement for their child, the Parent has chosen to reject said public school placement in favor of placing their child in Bay Ridge Preparatory School. Furthermore, the Parent acknowledges that, due to his/her financial status, he/she is dependent upon receiving prospective payment from the New York City Department of Education (the DOE) following an Impartial Hearing in order to make the payment of tuition . . . .

8

(Ex. B.)  Item 4 provides:

> The Parent further acknowledges that the Bay Ridge
> Preparatory School has assumed the risk that the Parent may
> not receive prospective payment from the DOE or that said
> payment will be delayed beyond the term of the 2005-2006
> school year.  In consideration of Bay Ridge Preparatory's
> assumption of such a risk, the Parent agrees to cooperate
> fully in all efforts by his/her attorney and Bay Ridge
> Preparatory schools personnel to secure funding from the
> DOE for his/her child's placement at the Bay Ridge
> Preparatory School.  The parent understands and agrees
> that, in the event that the Parent does not co-operate
> fully in the process, Bay Ridge Preparatory School may
> elect, upon 30 days notice, to terminate the child's
> enrollment at the Bay Ridge Preparatory School.

(Ex. B.)  At the bottom of the contract, the signature block

states: "In the case of two parents both must sign," or, "[i]n

the case of divorced parents the parent responsible for payments

must sign."  (Ex. B.)  S.W. states that it has always been her

understanding that the enrollment contract held her legally

responsible for paying the tuition if the DOE did not provide

payment.  (S.W. Aff. ¶ 17.)

On September 8, 2005, M.W. began classes in the tenth grade

at Bay Ridge.  (Pl.'s 56.1 Statement ¶ 25; Def.'s 56.1 Resp. ¶

25; Ex. C.)  In early October 2005, S.W. visited the CSE's

proposed placement, James Madison, to visit a class and discuss

the placement with a special education counselor.  (Pl.'s 56.1

Statement ¶¶ 22, 26; Def.'s 56.1 Resp. ¶¶ 22, 26; Tr. 25-27.)[2]

---

[2] At the hearing before the Impartial Hearing Officer, the plaintiff
testified that she tried to get an appointment before October 2005, but that
"it was impossible to get an appointment to view the classes before that."
(Tr. 25.)  The plaintiff testified that the school explained to her that it

According to S.W., she informed her advocate in mid-October 2005 that she was rejecting the proposed placement at James Madison. (Def.'s 56.1 Statement ¶ 14; Pl.'s 56.1 Resp. ¶ 1; Tr. 54-55.) However, she did not at that time inform the CSE or the DOE of her decision to reject the proposed placement. (Def.'s 56.1 Statement ¶ 15; Pl.'s 56.1 Resp. ¶ 2; Tr. 54-56.)

In fact, S.W. did not give notice to the DOE that she had rejected the public school placement and had enrolled M.W. at Bay Ridge until the following January. By letter dated January 12, 2006, S.W.'s advocate wrote on her behalf to request an impartial hearing seeking direct tuition payment to Bay Ridge for the 2005-2006 school year. (Def.'s 56.1 Statement ¶ 16; Pl.'s 56.1 Resp. ¶ 1; Ex. I.) The letter notes that S.W. did not think that a 15:1 special education placement was appropriate for her son and that she had rejected the recommended placement at James Madison. (Ex. I.) An impartial hearing was held over multiple sessions, on July 19, 2006, September 14, 2006, and December 19, 2006. (Pl.'s 56.1 Statement ¶ 29; Def.'s 56.1 Resp. ¶ 29.)

On March 2, 2007, the IHO issued his Findings of Fact and Decision (the "IHO Decision") ordering the DOE to pay to Bay

---

had just started and that they preferred for her to see "a smooth operation" rather than in the beginning of the school year. (Tr. 25-26.) The reasonable inference from this testimony is that the plaintiff first sought to visit James Madison at the beginning of the school year, in September 2005.

Ridge the cost of M.W.'s tuition for the 2005-2006 school year. (IHO Decision at 12.)  The IHO found that the school district had failed to offer M.W. a FAPE because the CSE was improperly constituted and did not ensure that his IEP was based on accurate measures of M.W.'s aptitude.  (IHO Decision at 6-7.) The IHO further found that the special education program at Bay Ridge was appropriate and capable of meeting M.W.'s needs.  (IHO Decision at 8.)  Finally, the IHO concluded that equitable considerations favored S.W..  (IHO Decision at 8-12.)  However, the IHO did find that the enrollment contract relieved S.W. of liability for M.W.'s tuition, and noted that it was a matter of concern that S.W. was not asking for reimbursement, but rather for direct payment to the school.  (IHO Decision at 8-12.) Ultimately, the IHO concluded:

> [I]t should be of little difference whether the local educational agency is required to reimburse a parent who had the wherewithal to initially pay tuition and thereafter seek reimbursement or to have the local educational agency be required to prospectively pay tuition to an educational facility which a parent cannot afford and without which a child would have no chance for the opportunity to receive an appropriate education.

(IHO Decision at 11.)  Accordingly, he ordered the DOE to pay the cost of M.W.'s tuition for the 2005-2006 school year directly to Bay Ridge.  (IHO Decision at 12.)

The DOE appealed the decision to the SRO.  S.W. cross-appealed that part of the IHO Decision finding that she did not

take on any financial risk in placing her son at Bay Ridge for
the 2005-2006 school year.  In a decision dated July 5, 2007
(the "SRO Decision"), the SRO dismissed S.W.'s cross-appeal and
sustained the DOE's appeal in part, thereby reversing the IHO's
award of tuition payment to Bay Ridge.  The SRO found "no reason
to disturb" the IHO's decision that the school district had
failed to offer M.W. a FAPE.  (SRO Decision at 4.)  The SRO also
did not review the IHO's finding that Bay Ridge was an
appropriate placement, noting that the DOE had not appealed that
finding.  (SRO Decision at 4.)

     With respect to the IHO's last finding that the equities
favored S.W., however, the SRO reversed the IHO's decision.  The
SRO found that S.W. had not given the DOE timely notice of her
rejection of the district's placement and her intent to enroll
her son in a private school.  (SRO Decision at 4.)  In the
alternative, the SRO also found that the IHO had erred by
awarding tuition costs directly to Bay Ridge.  (SRO Decision at
5-6.)  Although the SRO found that S.W. had standing to
challenge the appropriateness of M.W.'s IEP, he concurred in the
IHO's interpretation of the contract as placing financial
responsibility upon Bay Ridge and concluded that she had
therefore not suffered any "out-of-pocket" loss.  (SRO Decision
at 5.)  The SRO found that Bay Ridge had incurred a financial
burden, but that S.W. could not assert a claim for relief on the

school's behalf because it was a private entity that lacked

standing to sue under the IDEA.  (SRO Decision at 6.)  On

November 5, 2007, S.W. filed this appeal.

S.W. states under oath that she is currently indebted to

Bay Ridge for the full tuition amount for the 2005-2006 school

year.  (S.W. Aff. ¶ 41.)  She asserts that she sought a loan to

pay M.W.'s tuition for the 2005-2006 school year from the Hebrew

Free Loan Society which, according to S.W., provides interest-

free loans to parents who have obtained a final decision from an

IHO or have entered into settlements with the DOE.  (S.W. Aff. ¶

42.)  Because the SRO reversed the award of tuition costs, S.W.

alleges that she was therefore unable to obtain a loan from

them.  (S.W. Aff. ¶ 42.)  She also asserts that Bay Ridge has

never waived M.W.'s tuition costs for the 2005-2006 school year

and has never awarded M.W. any scholarships to lessen his

tuition costs.  (S.W. Aff. ¶¶ 43-44.)

### III.

In School Committee of the Town of Burlington v. Department

of Education, 471 U.S. 359 (1985), the Supreme Court held that

parents who believe that their child's IEP fails to meet the

requirements of the IDEA may, at their own financial risk,

enroll the child in a private school and seek retroactive

reimbursement of tuition from the state.  See id. at 370.  This

case differs from Burlington, however, in that S.W. requests

retroactive payment directly to Bay Ridge, rather than
retroactive reimbursement to her.

**A.**

The initial question is whether S.W. has standing to assert
a claim seeking the direct payment of M.W.'s 2005-2006 tuition
to Bay Ridge.  Article III of the Constitution of the United
States limits the jurisdiction of federal courts to "Cases" and
"Controversies."  Lujan v. Defenders of Wildlife, 504 U.S. 555,
559 (1992).  To satisfy the requirements of Article III
standing, a plaintiff must show that (1) she has suffered an
actual or imminent injury in fact, which is concrete and
particularized; (2) there is a causal connection between the
injury and defendant's actions; and (3) it is likely that a
favorable decision in the case will redress the injury.  Id. at
560-61.  "The party invoking federal jurisdiction bears the
burden of establishing these elements."  Id. at 561.

Because the judicial power of federal courts "exists only
to redress or otherwise protect against injury to the
complaining party," federal jurisdiction "can be invoked only
when the plaintiff himself has suffered 'some threatened or
actual injury resulting from the putatively illegal action . . .
.'"  Warth v. Seldin, 422 U.S. 490, 499 (1975) (quoting Linda
R.S. v. Richard D., 410 U.S. 614, 617 (1973)).  Moreover, the
requirement of standing "subsists through all stages of federal

14

judicial proceedings, trial and appellate . . . ."  Spencer v.
Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank
Corp., 494 U.S. 472, 477-78 (1990)).  "This means that,
throughout the litigation, the plaintiff 'must have suffered, or
be threatened with, an actual injury traceable to the defendant
and likely to be redressed by a favorable judicial decision.'"
Id. (quoting Lewis, 494 U.S. at 477).

     The DOE argues that S.W. does not have standing to assert a
claim for the cost of tuition because she has not paid and does
not owe any money to Bay Ridge and therefore has not suffered an
injury in fact.  S.W. responds that she has standing based on
two distinct injuries:  the alleged debt she has incurred to Bay
Ridge for the cost of her son's 2005-2006 tuition, and the DOE's
failure to provide a FAPE to her son.  The Court addresses these
arguments in turn.

**1.**

     First, S.W. asserts that she has suffered an injury in fact
in that she is ultimately responsible under the 2005-2006
enrollment contract for paying to Bay Ridge the cost of M.W.'s
tuition.  Under her reading of the enrollment contract, it
plainly and unambiguously holds her responsible for payment of
the tuition.  The DOE disputes this interpretation and argues
that it plainly and unambiguously relieves her of any such
obligation.

There is no dispute that New York law governs the
interpretation of the enrollment contract.  Under New York law,
"[t]he threshold question in a dispute over the meaning of a
contract is whether the contract terms are ambiguous."  Revson
v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000).  If a
contract is unambiguous, a court is "required to give effect to
the contract as written and may not consider extrinsic evidence
to alter or interpret its meaning."  Consarc Corp. v. Marine
Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993); see also
Alexander & Alexander Servs., Inc. v. These Certain Underwriters
at Lloyd's, London, 136 F.3d 82, 86 (2d Cir. 1998).  Contractual
language "whose meaning is otherwise plain is not ambiguous
merely because the parties urge different interpretations in the
litigation."  Metro. Life Ins. Co. v. RJR Nabisco, Inc., 906
F.2d 884, 889 (2d Cir. 1990).  Where the contractual language is
subject to more than one reasonable meaning and where extrinsic
evidence of the parties' intent exists, the question of
interpretation should be submitted to the trier of fact.  See
Alexander & Alexander, 136 F.3d at 86; Consarc, 996 F.2d at 573.

The language of a contract is unambiguous when it has "a
definite and precise meaning, unattended by danger of
misconception in the purport of the [contract] itself, and
concerning which there is no reasonable basis for a difference
of opinion."  Revson, 221 F.3d at 66 (internal quotations

omitted).  Contract language is ambiguous when it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  Id. (quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)).

In this case, the language of the enrollment contract is unambiguous, and it plainly relieved S.W. of responsibility for the cost of her son's tuition.  Item 2 includes an acknowledgement by S.W. that she "is dependent upon receiving prospective payment from [the DOE] . . . in order to make the payment of tuition . . . ."  This language contemplates that if S.W. does not receive prospective payment from the DOE, she will not be able to pay tuition, and Bay Ridge will not be paid. Item 4 provides explicitly that Bay Ridge "has assumed the risk that the Parent may not receive prospective payment from the DOE or that said payment will be delayed beyond the term of the 2005-2006 school year."  The natural import of this language is that if S.W. did not receive prospective payment from the DOE, then Bay Ridge would not receive payment for tuition at all. This reading is consistent with other language in Item 4 which provides that the parent will fully cooperate with Bay Ridge to

secure funding from the DOE "[i]n consideration of Bay Ridge Preparatory's assumption of such a risk."

S.W.'s desired interpretation strains the plain language of the contract past its limits. For example, S.W. relies heavily on the language above the signature block which says "the parent responsible for payments must sign." However, the first half of that sentence indicates that it applies "[i]n the case of divorced parents" and that it serves to identify the parent who has financial responsibility for the child rather than to impose responsibility for tuition payments upon the parent signing the contract. In the case of parents who are not divorced, the signature block does not even address the issue of responsibility for payment.

S.W. also attempts to inject ambiguity into the contract by pointing out that it refers only to prospective payment. S.W. would read this to mean that if the DOE did not provide prospective payment, then she would bear responsibility for paying tuition retroactively. However, this reading does not comport with the acknowledgement in Item 2 that S.W. cannot make tuition payments, nor with the other language in Item 4 which states that the penalty for non-cooperation could be the termination of the child's enrollment on 30 days' notice, not an effort to recoup the tuition payments from the parent. If S.W. were truly on the hook for tuition payments if the DOE refused

prospective payment, it does not make immediate sense why Bay
Ridge would threaten to terminate the child's enrollment if she
were not to cooperate, rather than to seek reimbursement from
the parent.

There is some evidence that S.W. attempted to obtain funds
to pay Bay Ridge – she cites the fact that she sought a loan
from the Hebrew Free Loan Society to make payment to Bay Ridge.
She also asserts that she believed she was required to pay Bay
Ridge.  However, when a contract is unambiguous, the Court must
give effect to its plain meaning and may not look to extrinsic
evidence to interpret it.  <u>Alexander & Alexander</u>, 136 F.3d at
86; <u>Consarc</u>, 996 F.2d at 573.

In sum, taking the enrollment contract as a whole, it is
plain that the contract relieved S.W. of financial
responsibility in the event that the DOE refused to pay her
son's 2005-2006 tuition at Bay Ridge.  This conclusion is
further bolstered by the fact that both the IHO and SRO, both of
whom are familiar with the customs, practices, and terminology
of private schools and whose determinations are owed deference
by this Court, also interpreted the enrollment contract to place
ultimate financial responsibility solely on Bay Ridge.
Therefore, S.W. does not have standing based on any financial
indebtedness to Bay Ridge.

However, the fact that the enrollment contract relieved S.W. of financial responsibility does not end the inquiry. Even though S.W. has no financial obligation under the enrollment contract to pay Bay Ridge, she nonetheless has a continuing obligation under the contract "to cooperate fully in all efforts by his/her attorney and Bay Ridge Preparatory schools personnel to secure funding from the DOE for his/her child's placement at the Bay Ridge Preparatory School," enforceable under threat of termination of M.W.'s enrollment upon 30 days notice. (Ex. B.) The Court of Appeals has held that "[i]njury in fact is a low threshold" and "may simply be the fear or anxiety of future harm," Ross v. Bank of Am., N.A., 524 F.3d 217, 222 (2d Cir. 2008) (internal quotations and citation omitted), although the fear of future harm must be "actual and well-founded," Port Washington Teachers' Assoc. v. Bd. of Educ. of the Port Washington Union Free Sch. Dist., 478 F.3d 494, 500 (2d Cir. 2007).

The problem with this argument is that M.W. is now in college; thus, neither he nor his mother face any threat of harm from termination of his enrollment. While potential civil liability can constitute an injury in fact, it is the plaintiff's burden to demonstrate that the fear of such liability is "well-founded." Id. Here, S.W. has not submitted any evidence that Bay Ridge believes her to be responsible for

tuition payment, nor that they would otherwise seek to hold her liable for noncompliance with the contract.  Moreover, in the unlikely event that Bay Ridge sought payment from S.W., she could rely confidently on the terms of the contract pursuant to which Bay Ridge assumed the risk that the DOE would not pay the tuition.

**2.**

S.W. asserts as an alternative basis for standing her injury in fact based upon a violation of her right to have her son provided with a FAPE at public expense.

"Congress may create a statutory right the alleged violation of which constitutes injury in fact." Heldman v. Sobol, 962 F.2d 148, 154 (2d Cir. 1992).  The denial of a FAPE or of a procedural right created by the IDEA thus constitutes an injury sufficient to satisfy the standing requirement.  See id. at 154-56 (denial of impartial due process hearing); Fetto v. Sergi, 181 F. Supp. 2d 53, 66 n. 22 (D. Conn. 2001) (denial of FAPE).  A claim for the denial of a FAPE for a child can be pursued by the child's parent.  See Heldman, 962 F.2d at 154-56.  Therefore, as the SRO also concluded, S.W. has standing under the IDEA to seek a remedy for the DOE's failure to provide M.W. with a FAPE.  (SRO Decision at 5.)  See also 20 U.S.C. § 1415(b)(6).

The DOE argues that S.W. nonetheless lacks standing to bring this action because the denial of a FAPE to her son cannot be redressed by the relief she seeks, namely, direct tuition payment to Bay Ridge.  The DOE also argues that S.W. no longer has an injury because M.W. already received an appropriate education from Bay Ridge for the 2005-2006 school year.  Both of these arguments are flawed.

For a plaintiff to have standing, it is true that the relief sought by the plaintiff must be likely to redress the plaintiff's alleged injury.  See Jenkins v. United States, 386 F.3d 415, 418-19 (2d Cir. 2004).  However, the relief sought by S.W. does redress her injury.  The IDEA requires school districts to provide disabled children with a FAPE, which is defined by the statute, in relevant part, as "special education and related services that . . . have been provided at public expense . . . ."  20 U.S.C. § 1401(9).  Here, it is undisputed that M.W. received an appropriate education at Bay Ridge during the 2005-2006 school year, but importantly, that education was not provided at public expense.  If the Court orders the DOE to pay M.W.'s tuition to Bay Ridge, as S.W. requests, M.W. will have received a FAPE, that is, an appropriate education at public expense.  Borrowing language from Burlington, this relief would redress S.W.'s injury by requiring the DOE "to belatedly pay expenses that it should have paid all along and would have

borne in the first instance had it developed a proper IEP."  471

U.S. at 370-71.  Moreover, unlike in Jenkins, where the relief

sought would not have ended the controversy in that case, the

entry of an order directing the DOE to pay Bay Ridge would

resolve S.W.'s dispute with the DOE.  This plainly meets the

requirements of redressability.

The DOE's reliance on Emery v. Roanoke City Sch. Bd., 432

F.3d 294 (4th Cir. 2005), for the proposition that S.W.'s injury

based on the denial of a FAPE can no longer be redressed is

misplaced.  In Emery, the plaintiff's parents placed him in a

private hospital after the school district failed to provide him

with an IEP.  However, the plaintiff incurred no expense for his

education because his father's medical insurance paid the

plaintiff's hospital bills.  Years later, after the plaintiff

was no longer a student, he brought suit under the IDEA to seek

reimbursement for the hospital expenses.  The Court of Appeals

for the Fourth Circuit held that the plaintiff lacked standing.

The court noted that the plaintiff had suffered an injury in

that his school district had not provided him with an IEP for

the 1992-1993 school year, but that this "core injury" was no

longer redressable.  Id. at 299.  The court went on to conclude

that the plaintiff had no subsidiary injury because,

"[c]rucially for the purposes of standing, he suffered no out-

of-pocket loss himself for the services that [the hospital] provided." Id.

The plaintiff's "core injury" in Emery was not redressable, however, because his father's insurance company had already paid his educational expenses in full. Therefore, as the court in Emery explained, awarding "reimbursement" to the plaintiff would not be paying for his education, but would be purely "a windfall." Id. at 299. In this case, payment of M.W.'s 2005-2006 tuition to Bay Ridge would not be a windfall because no one has yet paid for that year of his education. Because the denial of a FAPE to M.W. is still redressable in this case, S.W. has standing to bring this action.

**B.**

Although S.W. has standing to bring this claim, it is unnecessary to determine whether, under the IDEA, a parent who cannot afford to pay the costs of her child's private school placement can seek retroactive tuition payment from the state directly to the private school because, as explained below, the Court finds that the equities do not warrant such an award in this case. Amici request this Court to declare that an IHO or a court may order a school district to make direct tuition payments retroactively to a private school in order to ensure that a disabled student receives a FAPE. They argue that the availability of a private school education when a school

24

district has failed to provide a FAPE should not be limited to those families with sufficient resources to pay in advance for a private education.  Burlington specifically authorized retroactive reimbursement to parents as an appropriate remedy where the parents correctly determined that the IEP was inappropriate and assumed the financial risk of placing their child in an appropriate private school.  471 U.S. at 370-71. Some courts have, however, ordered school districts to make prospective tuition payments directly to a private school.  See, e.g., Draper v. Atlanta Indep. Sch. Sys., 518 F.3d 1275, 1284-86 (11th Cir. 2008) (prospectively awarding plaintiff with placement in private school); Sabatini v. Corning-Painted Post Area Sch. Dist., 78 F. Supp. 2d 138 (W.D.N.Y. 1999) (granting preliminary injunction requiring district to pay for private placement and instructing district to "make whatever financial arrangements are necessary" to allow student to attend private school); see also Connors v. Mills, 34 F. Supp. 2d 795 (N.D.N.Y. 1998) (noting in dicta that a district court could order prospective payment directly to a private school if the parent showed that he or she was unable to front the cost of the private school).  The parties have cited no case in which a court has ordered direct tuition payment to a private school on a retrospective basis.  In a case where the equities favor such an award, there may be good reasons why direct tuition payment

should be a remedy available to a needy parent, on either a prospective or retrospective basis.  However, that is not this case.

### C.

The Supreme Court has established a two-part test to determine whether parents are entitled to reimbursement: (1) whether the IEP proposed by the school district was inappropriate, and (2) whether the private placement was appropriate to the child's needs.[3]  Gagliardo, 489 F.3d at 111-12 (citing Burlington, 471 U.S. at 370).  The burden of persuasion rests with the party seeking relief, which in this case is the plaintiff.  See Schaffer v. Weast, 546 U.S. 49, 56 (2005).  If parents carry their burden of showing that the IEP was deficient and that the private placement was appropriate, the Court has discretion to consider equitable factors relating to the reasonableness of the parents' action in fashioning relief. A.C., 553 F.3d at 171; see also Gagliardo, 489 F.3d at 112 (citing Florence County Sch. Dist. Four v. Carter, 510 U.S. 7, 16 (1993)).

---

[3] Although S.W. seeks retroactive direct tuition payment rather than retroactive reimbursement, the Burlington analysis would apply to her claim, assuming, that is, that the IDEA provides for direct tuition payment.  In either case, relief would only be warranted if a court determined that the IEP was inappropriate and that the private placement was proper.  Because a court's authority to grant relief in IDEA cases derives from 20 U.S.C. § 1415(e)(2), which authorizes "such relief as the court determines is appropriate," equitable considerations would also be equally relevant in a direct payment case.  See Burlington, 471 U.S. at 374.

S.W. argues that the SRO's holding that the equities precluded an award of the cost of tuition to Bay Ridge should be reversed for two reasons.  First, S.W. argues that the SRO exceeded his jurisdiction by raising the notice requirement when the DOE had not made a notice argument in its petition at the state review level.  Second, she argues that the notice requirement does not apply to students who are already enrolled in private school, because the relevant portion of the statute refers to giving ten days' notice "prior to the removal of the child from the public school."  See 29 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).  Neither of these arguments are persuasive.

**1.**

First, S.W. argues that the SRO improperly raised the notice issue when the parties had not made this argument in the course of the administrative review.  The DOE asserts that it raised the issue of the notice requirement in its Verified Petition to the SRO.  While the Verified Petition did not explicitly argue that tuition payment should be denied because S.W. failed to give timely notice to the DOE of her intention to enroll M.W. at Bay Ridge, the Verified Petition did raise the argument that the equities weighed against granting relief, and it specifically cited the timely notice requirement in 20 U.S.C. § 1412(a)(10)(C)(iii) as one of the relevant equitable

considerations.  (Verified Pet. ¶ 72.)  Moreover, the Verified
Petition also argued "that the equities bar tuition funding to
Bay Ridge where the parent agreed in advance of the 2005-2006 SY
to baselessly reject the DOE placement out of hand without
giving the DOE the opportunity to provide FAPE to her son for
the 2005-2006 SY." (Verified Pet. ¶ 12.)  While couched as an
argument based on S.W.'s lack of cooperation, the allegations
also support a finding that S.W. failed to notify the DOE in a
timely manner that would have allowed them to work with her to
find an appropriate placement within the public school system.
Indeed, the notice requirement serves the important function of
facilitating cooperation between parents and school districts by
requiring parents to give the school system an opportunity to
provide the student with a FAPE in public school before
resorting to a private school placement.  See Greenland Sch.
Dist. v. Amy N., 358 F.3d 150, 160 (1st Cir. 2004); Carmel Cent.
Sch. Dist. v. V.P., 373 F. Supp. 2d 402, 414 (S.D.N.Y. 2005).

        This case is therefore not like the cases cited by S.W. in
which the hearing officer improperly made a finding on an
unrelated issue that had not been raised by the parties, or on
an issue that had already been finally decided in the impartial
hearing below and had not been appealed.  See, e.g., Metro. Bd.
of Public Educ. v. Guest, 193 F.3d 457, 463 (6th Cir. 1999)
(holding that district courts may not review an IEP in an

administrative hearing when the parent has not challenged the IEP); Hiller v. Bd. of Educ., 674 F. Supp. 73, 77 (N.D.N.Y. 1987) (holding that the Commissioner violated the finality requirement of administrative decision by finding that student was not disabled, when the issue on appeal was whether the student's IEP was appropriate and the student's disabled status was uncontested). Here, the DOE squarely placed equitable considerations before the SRO, and the SRO appropriately relied on the notice requirement to reach his decision. See J.S. v. North Colonie Cent. Sch. Dist., 586 F. Supp. 2d 74, 86 (N.D.N.Y. 2008) (holding that the IHO properly considered the issue of transition services in a challenge to a proposed IEP because transition services are a component of a FAPE). Moreover, the DOE's arguments about S.W.'s lack of cooperation also raised issues of timely notice, and the SRO properly considered them.

**2.**

S.W.'s argument that the notice requirement did not apply to her is also without merit. First, she appears to have misread the SRO Decision to have applied only the notice requirement in 20 U.S.C. § 1412(a)(10)(C)(iii)(1)(bb).[4]  However,

_____

[4] The relevant portion of the statute provides: "The cost of reimbursement described in clause (ii) may be reduced or denied—

(I) if--

(aa) at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents

the SRO applied both Subsections (aa) and (bb), concluding that
S.W. had failed to notify the CSE at the June 2, 2005 CSE
meeting that she would be rejecting the public school placement
and enrolling M.W. at Bay Ridge, and that she did not provide
written notice of that decision until January 12, 2006.  (SRO
Decision at 4.)  However, Subsection (aa) also refers to the
"removal of the child from the public school."

Nonetheless, S.W.'s argument still fails.  While S.W.
quotes language from various cases and the legislative history
in support of her position that Subsections (aa) and (bb) apply
only to students being removed from public school, these
statements only pass upon the importance of notice before
removing a child from public school.  In none of these cases or
excerpts from the legislative history is there any support for

did not inform the IEP Team that they were rejecting the
placement proposed by the public agency to provide a free
appropriate public education to their child, including stating
their concerns and their intent to enroll their child in a
private school at public expense; or

(bb) 10 business days (including any holidays that occur on a
business day) prior to the removal of the child from the public
school, the parents did not give written notice to the public
agency of the information described in item (aa);

(II) if, prior to the parents' removal of the child from the public
school, the public agency informed the parents, through the notice
requirements described in section 1415(b)(3) of this title, of its
intent to evaluate the child (including a statement of the purpose of
the evaluation that was appropriate and reasonable), but the parents
did not make the child available for such evaluation; or

(III) upon a judicial finding of unreasonableness with respect to
actions taken by the parents.

20 U.S.C. § 1412(a)(10)(C)(iii).

the proposition that notice is important only when a child is in public school, or that parents of students currently enrolled in private school are exempted from the notice requirements altogether.

As the Court of Appeals for the Second Circuit has noted, before the IDEA was amended in 1997 to include the notice requirements in subsections (aa) and (bb), courts "held uniformly that reimbursement is barred where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." M.C. v. Voluntown Bd. of Educ., 226 F.3d 60, 68 (2d Cir. 2000).  In M.C., the Court of Appeals held that the plaintiff was not entitled to reimbursement for the costs of private psychological counseling services which his parents sought without notifying the school board beforehand of their dissatisfaction with the plaintiff's IEP.  Id. at 68-69. Notably, when the plaintiff began receiving counseling services, he had already been removed from the public school and was being home-schooled at that time.  In discussing the notice requirements contained in subsections (aa) and (bb), the Court of Appeals noted that they appeared "to codify the previously recognized discretion of a court to reduce or bar reimbursement

where parents fail to raise the appropriateness of an IEP in a
timely manner."[5]  Id. at 69 n.9.

    The reading advanced by S.W. would mean that parents of
children who are enrolled in private schools at public expense,
or who are otherwise not currently enrolled in a public school,
have no obligation whatsoever to notify their local school
district before unilaterally enrolling or re-enrolling their
children in private school.  This interpretation defeats the aim
of the IDEA to provide children with a FAPE in public schools
and would allow such parents to enroll or re-enroll their
children in private schools without giving any consideration to
a public school placement.  See W.S. ex rel. C.S. v. Rye City
Sch. Dist., 454 F. Supp. 2d 134, 148 (S.D.N.Y. 2006) (noting
that the IDEA views public school as "the preferred venue for
educating the child" and "private school as a last resort").
This reading is plainly mistaken.  See Greenland, 358 F.3d 150
(applying notice requirements where parents had re-enrolled
child at private school); see also Roark v. District of
Columbia, 460 F. Supp. 2d 32, 41 & n.9 (D.D.C. 2006) (assuming
without deciding that notice requirements applied to parents
whose child was already enrolled in a private school at public
expense and who removed the child to another private school).

_____

    [5] Subsections (aa) and (bb) did not apply to M.C.'s claim for
reimbursement of his counseling expenses because those services were provided
and paid for before June 4, 1997, the effective date of the amendments.

A similar issue has arisen under 20 U.S.C. §
1412(a)(10)(c)(ii).  That section permits reimbursement to
parents of a child with a disability who has previously received
a special education under the authority of a public agency,
where the parents enroll the child in a private school without
the consent of the public agency, if the court or hearing
officer finds that the agency failed to make a FAPE available to
the child.  Judge McMahon considered and rejected the argument
that a child who had been re-enrolled in private school should
be entitled to reimbursement even though the child's parents had
never requested special educational services from a public
agency.  See Carmel, 373 F. Supp. 2d at 410-15.  Reasoning that
the re-enrollment of the child in her private school constituted
the removal of the child from public school, the court held that
the parents' failure to give notice to the school district that
their child's special education was at issue, and to give the
district an opportunity to provide a FAPE, was fatal to their
reimbursement claim.  Id. at 414.

Similarly, in this case, the Court concludes that the
statute applied to M.W. who was receiving special education
services in a private school, paid for with public funds, such
that S.W. was required to provide adequate notice to the school
district so that it could be given the opportunity to devise a
FAPE.  The notice requirements applied to the plaintiff, and the

SRO properly concluded that S.W.'s failure to comply with them justified denying her relief.  In any event, under 20 U.S.C. § 1412(a)(10)(C)(iii), it remains within the discretion of the Court to reduce or deny reimbursement "upon a judicial finding of unreasonableness with respect to actions taken by the parents," a subject to which the Court now turns.

**3.**

S.W. does not attempt to refute the DOE's arguments that her delay in providing notice and her failure to cooperate were equitable factors weighing against an award of direct tuition payment.  Rather, she argues only that the DOE violated the IDEA by failing to reevaluate M.W. and by failing to offer an appropriate placement at the CSE meeting, and that the SRO erred by not considering these countervailing factors and denying tuition payment entirely.

While it is true that the DOE did not reevaluate M.W. after the June 2, 2005 CSE meeting, there is nothing in the record that indicates that S.W. requested a reevaluation.  Moreover, nothing about the DOE's failure to reevaluate M.W. explains why S.W. did not provide timely notice to the DOE or cooperate with the DOE's efforts to provide M.W. with a FAPE in a public school.  Lastly, the fact that the DOE failed to provide an adequate FAPE is a fact common to all due process challenges that meet the first prong of Burlington; it is not an

independent factor that should be considered when weighing the equities.

The Court is therefore left with the facts that S.W. did not inform the CSE that she was rejecting the public school placement and enrolling M.W. at Bay Ridge, that she signed an enrollment contract agreeing to reject the public school placement two months before even visiting the proposed public school, and that she did not give written notice of her decision to the DOE until seven months after the CSE meeting, four months after M.W. began the 2005-2006 school year at Bay Ridge, and three months after visiting the public school placement.  These actions evince unreasonable delay and the lack of a good faith effort to cooperate with the DOE to find an appropriate public school placement for her son, and they warrant the denial of direct tuition payment here.  See M.C., 226 F.3d at 68-69; Bettinger v. New York City Bd. of Educ., No. 06 Civ. 6889, 2007 WL 4208560, at *9 (S.D.N.Y. Nov. 20, 2007) (holding that equitable considerations did not favor parents' claim where they failed to cooperate with the district's efforts to place their son); Carmel, 373 F. Supp. 2d at 415 (denying tuition reimbursement to parents where parents did not give notice to the CSE until after re-enrolling their child in private school and where facts indicated that parents never seriously

25

considered public school placement).  Summary judgment in favor
of the DOE is therefore granted.

## CONCLUSION

The Court has considered all of the arguments raised by the
parties.  To the extent not specifically addressed above, the
arguments are either moot or without merit.  For the reasons
discussed above, the DOE's motion for summary judgment (Docket
No. 13) is **granted** and S.W.'s motion for summary judgment
(Docket No. 22) is **denied**.  The amicus organizations' motion for
leave to file a memorandum of law amicus curiae (Docket No. 16)
is **granted**.  The Clerk of the Court is directed to enter
judgment for the DOE and to close this case.

**SO ORDERED.**

**Dated:  New York, New York**
       **March 30, 2009**

John G. Koeltl
United States District Judge